**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN THE MATTER OF THE TAX
LIABILITIES OF:

JOHN DOES, United States taxpayers who,
at any time during the years ended December
31, 2013, through December 31, 2020, used
the services of Panama Offshore Legal
Services, including its predecessors,
subsidiaries, and associates, to establish,
maintain, operate, or control any foreign
financial account or other asset; any foreign
corporation, company, trust, foundation or
other legal entity; or any foreign or domestic
financial account or other asset in the name of
such foreign entity.

Case No. 21 Misc. 424

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'**
***EX PARTE* PETITION FOR LEAVE TO SERVE JOHN DOE SUMMONSES**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
*Attorney for Petitioner*
*United States of America*
86 Chambers Street, Third Floor
New York, New York 10007
Telephone:  (212) 637-2822
Facsimile:   (212) 637-2702

TALIA KRAEMER
Assistant United States Attorney
    – Of Counsel –

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT…………………………………………………………1

BACKGROUND………………………………………………………………………2

   I.   U.S. Taxpayers Must Report Foreign Income and Disclose Foreign Financial Accounts and Entities………………………………………………......................................2

   II.   Offshore Tax Evasion………………………………………………………………..3

   III.   POLS and the POLS Group…………..……...…………………………………5

      A. POLS and Its Associates………………………………………………………….5

      B. The POLS Group Offers Services To Assist U.S. Clients in Concealing Assets………...6

      C. Information from Other Sources Corroborates the IRS's Belief that U.S. Taxpayers Use the POLS Group to Evade Taxes…………………………………………………...10

   IV.   The Summonses………………………………………………………………10

ARGUMENT…………………………………………………………………………13

The Summonses Satisfy the Requirements for an IRS John Doe Summons……………………13

   I.   The Investigation Concerns an Ascertainable Class…………………………………16

   II.   There Is a Reasonable Basis To Believe that the John Doe Class May Fail, or May Have Failed, To Comply with the Internal Revenue Laws………………………….18

   III.   The Information Sought About the Target Class, Including the Identities of the Class's Members, Is Not Readily Available from Other Sources…………………………………………………………………………20

   IV.   The Information Sought Is Narrowly Tailored to Information that Pertains to the Failure or Potential Failure of the John Doe Class To Comply with the Internal Revenue Laws…………………………………………………………………22

Conclusion……………………………………………………………………………25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Tax Liab. of Does*,
   671 F.2d 977 (6th Cir. 1982) ............................................................... 18, 20

*In re Tax Liab. of Does*,
   No. 03-22793-CIV, 2003 WL 22953182 (S.D. Fla. Oct. 30, 2003) ................................... 17, 21

*In re Tax Liab. of Does*,
No. 2:10-mc-00130-MCE-EFB, 2011 WL 6302284, (E.D. Cal. Dec. 15, 2011)………………..16

*In re Tax Liabs. of Does*,
   688 F.2d 144 (2d Cir. 1982)................................................................... 18

*In re Tax Liabs. of Does*,
No. 00-cv-3919, 2000 WL 34538137, at *1 (S.D. Fla. Oct. 30, 2000) ................................... 21

*In re Tax Liabs. of Does*,
No. 02-22404-CIV, 2002 WL 32879613 (S.D. Fla. Aug. 20, 2002) ....................................... 21

*In re Tax Liabs. of Does*,
No. 11-cv-01686-PJH, Dkt. No. 10 (N.D. Cal. Apr. 7, 2011) ........................................... 21

*In re Tax Liabs. of Does*,
No. 13-mc-00021-P1, Dkt. No. 4 (S.D.N.Y. Jan. 29, 2013)............................................. 17, 21

*In re Tax Liabs. of Does*,
No. 13-mc-377-P1, Dkt. No. 3 (S.D.N.Y. Nov. 12, 2013) ............................................. 17, 21

*In re Tax Liabs. of Does*,
No. 13-mc-378-P1, Dkt. No. 3 (S.D.N.Y. Nov. 7, 2013) ............................................. 17, 21

*Mensh v. United States*,
   No. 08 Civ. 4162 (DLI) (ALC), 2009 WL 2242295 (E.D.N.Y. Jul. 27, 2009) ....................... 16

*PAA Mgmt., Ltd. v. United States*,
   962 F.2d 212 (2d Cir. 1992)................................................................... 14

*Schaeffler v. United States*,
   806 F.3d 34 (2d Cir. 2015)................................................................... 13, 22

*United States. v. Bisceglia*,
   420 U.S. 141 (1975)......................................................................... 14, 15

*United States v. Arthur Young & Co.*,
  465 U.S. 805 (1984) .................................................................................. 14

*United States v. Davey*,
  543 F.2d 996 (2d Cir. 1976) ...................................................................... 23

*United States v. Euge*,
  444 U.S. 707 (1980) .................................................................................. 14

*United States v. Pittsburgh Trade Exch., Inc.*,
  644 F.2d 302 (3d Cir. 1981) ...................................................................... 20

*United States v. Powell*,
  379 U.S. 48 (1964) .................................................................................... 23

*United States v. Ritchie*,
  15 F.3d 592 (6th Cir. 1994) ...................................................................... 20

*United States v. White*,
  853 F.2d 107 (2d Cir. 1988) ...................................................................... 23

**Statutes**

26 U.S.C. § 61 ............................................................................................... 2

26 U.S.C. § 6012 ........................................................................................... 2

26 U.S.C. § 6038 ........................................................................................... 3

26 U.S.C. § 6039F ......................................................................................... 3

26 U.S.C. § 6048 ........................................................................................... 3

26 U.S.C. § 7601(a) ..................................................................................... 14

26 U.S.C. § 7602(a) ..................................................................................... 14

26 U.S.C. § 7609(f) ............................................................................... *passim*

26 U.S.C. § 7609(f)(1) ........................................................................... 17, 22

26 U.S.C. § 7609(f)(3) ................................................................................. 22

26 U.S.C. § 7609(h) ....................................................................................... 2

26 U.S.C. § 7609(h)(1) ................................................................................. 16

26 U.S.C. § 7609(h)(1) ................................................................................................ 14

31 U.S.C. § 5314 ............................................................................................................ 3

## Regulations

26 C.F.R. § 1.6038-2(a) ................................................................................................ 3

31 C.F.R. § 1010.350 .................................................................................................... 3

## Other

H.R. Rep. No. 94-0658 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897..............................18

H.R. Rep No. 116-39, at 41 (2019) ...........................................................................23

Joint Committee on Taxation, *Description of H.R. 1957, the "Taxpayer First Act of 2019,"*
   (2019)..............................................................................................................23

The United States of America, by and through its attorney, Audrey Strauss, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its *ex parte* petition for leave to serve ten John Doe summonses (the "Petition").

## PRELIMINARY STATEMENT

The Internal Revenue Service has long been concerned with U.S. taxpayers who evade their federal tax obligations by concealing taxable income in offshore tax havens or jurisdictions that provide for financial secrecy.  Some taxpayers use offshore service providers to assist them in concealing assets, often by creating offshore entities and opening foreign financial accounts. One such provider is Panama Offshore Legal Services, a Panamanian firm that assists clients in concealing their beneficial ownership of assets ("POLS," and together with entities and websites that appear to be connected to POLS, "the POLS Group"[1]).

The IRS is currently investigating U.S. taxpayers who used the POLS Group's services to evade U.S. internal revenue laws.  Specifically, the IRS is seeking to identify the following class of persons:

> United States taxpayers who, at any time during the years ended December 31, 2013, through December 31, 2020, used the services of Panama Offshore Legal Services, including its predecessors, subsidiaries, and associates, to establish, maintain, operate, or control any foreign financial account or other asset; any foreign corporation, company, trust, foundation or other legal entity; or any foreign or domestic financial account or other asset in the name of such foreign entity.

---

[1] As used herein and in the Declaration of Katy Fuentes dated May 4, 2021 ("Fuentes Decl."), the POLS Group consists of the following entities: Panama Offshore Legal Services; Online Products, Inc.; Panama Title & Escrow; Panama Wholesale Offshore Services; Panama Corporation; Belize Corporations; Panama Mortgage Brokers; Panama Real Estate Group; Panama Tax Advisors; Panama Foundation; Panama Offshore Services International Inc.; Panama Surf Tours; and Panama Immigration Services.  Fuentes Decl. ¶ 42.

As part of its investigation, the IRS seeks to trace courier deliveries and electronic fund transfers between the POLS Group and its clients, in order to identify the POLS Group's U.S. taxpayer clients who have failed to comply with their tax obligations.

To obtain such information, the United States brings this *ex parte* proceeding under 26 U.S.C. §§ 7609(f) and (h) for leave to serve John Doe summonses (collectively, the "Summonses") on three groups of entities: (1) couriers believed to have shipping records relating to U.S. customers of the POLS Group; (2) financial institutions believed to have records of electronic funds transfers relating to U.S. customers of the POLS Group; and (3) U.S. banks that maintain correspondent accounts for Panamanian banks used by the POLS Group, which are expected to have records of transactions involving the POLS Group's U.S. customers.

The issuance of the Summonses is warranted because (i) they relate to the investigation of an ascertainable group or class of persons, namely, U.S. taxpayer-clients of the POLS Group; (ii) as described in detail below, there is a reasonable basis for believing these U.S. taxpayers may have failed to comply with the U.S. internal revenue laws; and (iii) information sufficient to establish these U.S. taxpayers' identities is not readily available to the IRS from other sources. *See* 26 U.S.C. § 7609(f).  Additionally, the IRS may issue the Summonses because the information sought is narrowly tailored to information that pertains to the failure (or potential failure) of U.S. taxpayer-clients of the POLS Group to comply with internal revenue laws.  *Id.*

## BACKGROUND

### I.   U.S. Taxpayers Must Report Foreign Income and Disclose Foreign Financial Accounts and Entities

U.S. taxpayers with gross annual income above a threshold amount must file an income tax return with the IRS reporting the taxpayer's income from all sources worldwide.  26 U.S.C. §§ 61, 6012.  U.S. taxpayers must also disclose certain foreign assets.  For example, an

individual U.S. taxpayer who has a financial interest in, or signature authority over, a foreign

financial account must disclose the existence of the account on Schedule B of the taxpayer's

income tax return.  *See* Schedule B (Form 1040 or 1040-SR), Interest and Ordinary Dividends,

Part III.  The taxpayer may also be required to report the account on a Report of Foreign Bank

and Financial Accounts, FinCEN Form 114 (the "FBAR").[2]  31 U.S.C. § 5314; 31 C.F.R.

§ 1010.350; Declaration of Katy Fuentes, dated May 4, 2021 ("Fuentes Decl.") ¶ 32.  U.S.

taxpayers are required to report certain transactions with foreign persons or trusts, *see* 26 U.S.C.

§§ 6039F, 6048, and any ownership of or control over foreign corporations, *see* 26 U.S.C.

§ 6038; 26 C.F.R. § 1.6038-2(a).

## II.    Offshore Tax Evasion

The IRS has learned that U.S. taxpayers evading their tax obligations may use offshore

entities such as corporations, trusts, or foundations to conceal their beneficial ownership of

foreign, and sometimes domestic, financial accounts and assets.  Fuentes Decl. ¶ 9(b).  Often,

taxpayers rely on offshore service providers to create the foreign entities and provide nominee

directors, officers, and trustees to conceal the taxpayer's beneficial ownership.  *Id.* ¶ 9(c).

Offshore service providers may also assist taxpayers in opening foreign financial accounts.  *Id.*

Through use of the offshore service provider, taxpayers may claim they have no connection to a

foreign asset or entity, while retaining control through means such as a side agreement with the

service provider.  *Id.* ¶¶ 88, 105.

One strategy used by offshore service providers to conceal clients' identities is use of a

shell corporation.  *Id*. ¶ 20 (citing *Private Banking and Money Laundering:  A Case Study of*

*Opportunities and Vulnerabilities:  Hearings Before the Senate Permanent Subcommittee on*

---

[2] Prior to 2014, the FBAR form was Form TD F 90-22.1.

*Investigations*, S. Hrg. 106-428 at 881-82 (1999) (Minority Staff Report)).  Shell corporations are usually formed in a foreign tax haven or country with financial privacy laws that restrict disclosure of the corporation's beneficial owner.  *Id.*  The offshore service provider opens accounts in the corporation's name, which prevents the individual who owns the shell corporation from being identified as the accounts' beneficial owner.  *Id.*

Of particular relevance here, the IRS knows that U.S. taxpayers use Panamanian entities to evade U.S. taxes.  The Swiss Bank Program, launched by the Department of Justice in August 2013, provided a path for Swiss Banks to resolve potential criminal liability in the United States. *Id.* ¶ 24.  Certain banks participating in the program provided statements detailing their interactions with U.S. customers.  *Id.* ¶ 25.  These statements revealed that at least half of the banks had permitted U.S. taxpayers to use Panamanian entities to open Swiss bank accounts that were beneficially owned by the U.S. taxpayer, but held in the Panamanian entity's name.  *Id.* ¶ 27.  In some cases, though the banks knew that a U.S. taxpayer was the account's beneficial owner, the bank accepted documentation falsely affirming that no U.S. person beneficially owned the account, thereby facilitating avoidance of U.S. reporting requirements and withholding taxes.  *Id.* ¶ 26.

Taxpayers with offshore financial accounts often access their funds through a correspondent account at a U.S. bank.  *Id.* ¶¶ 22-23.  When a foreign financial institution maintains a correspondent account at a U.S. bank, the foreign bank's clients can access the U.S. bank's services.  *Id.* ¶ 22.  Domestic owners of offshore accounts can use the U.S.-based correspondent account to facilitate transactions denominated in U.S. dollars and transfer funds to and from their offshore accounts.  *Id.* ¶ 23.  The IRS has learned that correspondent banking relationships may enable tax evasion, by facilitating the transfer of funds offshore.  *Id.* ¶ 22.

### III.    POLS and the POLS Group

### A.    POLS and Its Associates

POLS is a Panamanian law firm that has been providing offshore services since 2000. *Id.*

¶ 44. POLS forms corporations and foundations for its clients, for purposes of asset protection.

*Id.* POLS also offers, among other services, assistance with creating offshore bank accounts,

offshore brokerage accounts, and offshore merchant accounts, as well as offshore legal

consulting and immigration services. *Id.*

Through its investigation of POLS, the IRS has identified numerous POLS associates,

which are referred to herein, together with POLS and any officers or employees of POLS and its

associates, as the "POLS Group": Online Products, Inc.; Panama Title & Escrow; Panama

Wholesale Offshore Services; Panama Corporation; Belize Corporations; Panama Mortgage

Brokers; Panama Real Estate Group; Panama Tax Advisors; Panama Foundation; Panama

Offshore Services International Inc.; Panama Surf Tours;[3] and Panama Immigration Services.

*See id.* ¶¶ 59-104. The POLS Group associates share certain contact information with one

another and/or with POLS, *see id.* ¶¶ 60, 68, 73, 89, 93-94, and have shared employees, *see id.*

¶¶ 59, 66-67. Some serve as one another's agents or accept payment from one another's clients.

*See id.* ¶¶ 59, 80. Many have substantially similar webpages to POLS's site, *see id.* ¶¶ 74, 79,

83, 86, or maintain a webpage that links directly to POLS's website, *see id.* ¶¶ 83, 96.

Additionally, the "Client-Firm Representation Agreement" included in one of POLS's order

forms lists several POLS Group associates (including Panama Offshore Services International

Inc., Panama Title & Escrow Inc., Panama Real Estate Group Inc., and Panama Mortgage

---

[3] Despite this entity's name, its website also provided clients with information about the alleged
benefits of offshore bank accounts and Panamanian entities. *See* Fuentes Decl. ¶¶ 101-02.

Brokers, Inc.) among those whom the prospective client agrees to indemnify and hold harmless. *Id.* ¶ 43 & Ex. 1 at 13.

### B.    The POLS Group Offers Services To Assist U.S. Clients in Concealing Assets

The POLS Group offers services to help clients conceal ownership of offshore entities and accounts.  These services include anonymous banking, the establishment of offshore bank accounts, and the formation of offshore corporations, shelf corporations and foundations, and offshore trusts and foundations.  Fuentes Decl. ¶¶ 50, 53, 74, 79, 83, 91, 97.  The POLS Group's websites promote these offshore services as assisting clients in maintaining secrecy and protecting assets.  *See id.* ¶¶ 54, 75-78, 86, 95, 102.  Notably, the POLS Group specifically markets its services to U.S. clients.  *See, e.g.*, *id.* ¶¶ 76-77, 103.

POLS offers clients more than twenty offshore structures, including "packages" for anonymous entity formation with pre-packaged services.  *Id.* ¶ 53.  For example, POLS offers a "Panama Corporation Package" in which clients receive a Panamanian corporation, general power of attorney, and offshore account for $1,300.  *Id.* ¶ 53(a).  POLS also offers a "Complete Offshore Corporation and Foundation Package," in which an offshore corporation is created to hold certain assets, and then a Panamanian foundation serves as the holder of the corporation. *Id.*  The IRS's experience shows that such packages are designed and used to conceal the entities' beneficial owners and to facilitate the transfer of funds while concealing the true purpose and beneficiary of the transfer.  *Id.* ¶ 53.

POLS's website emphasizes that clients need only follow a small number of "simple procedures" to obtain their new offshore entities.  *Id.* ¶ 53(a)-(b).  POLS also offers "shelf" corporations and foundations, meaning that POLS can provide customers with ownership or control of entities already in existence.  *Id.* ¶ 53(c).  The IRS has learned that taxpayers sometimes use "shelf" entities to create the false impression that the entity had an operating

history prior to the taxpayer's involvement, so as to avoid the impression that the entity was created purely for tax avoidance.  *Id.*

POLS highlights secrecy as a key advantage of its entity formation services, promising its clients "100% anonymity, privacy and confidentiality."  *Id.* ¶ 50.  For example, POLS boasts that its dual corporation and foundation package offers "the utmost in offshore asset protection, anonymity, privacy, and convenience."  *Id.* ¶ 53(a).  POLS also offers its clients the ability to form corporations in Belize, the British Virgin Islands, and Nevis, emphasizing that the laws of Belize and Nevis allow anonymous ownership and have minimal disclosure requirements.  *Id.* ¶ 54.

POLS offers clients using its offshore entity services additional options to further facilitate anonymity.  For instance, POLS offers clients the choice of using nominee directors and officers for their offshore entities and provides pre-selected individuals to serve in those roles.  *Id.* ¶ 52.  In the IRS's experience, nominee officers and directors are often used to conceal beneficial ownership by disguising the beneficial owner's affiliation with the entity.  *Id.*  POLS advertises that Panamanian corporations can be owned anonymously through bearer shares, which are shares owned by the person who possesses the physical stock certificate.  *Id.* ¶ 51.  Because bearer shares can be freely transferred, the corporation cannot maintain a record of the shares' owner, creating an additional level of anonymity.  *Id.*  POLS also offers mail-forwarding services, which can assist U.S. persons in concealing their beneficial ownership by allowing the U.S. person to avoid creating a "paper trail" in the United States.  *Id.* ¶ 55.

In addition to offshore entity formation, POLS offers clients assistance with opening offshore financial accounts.  *Id.* ¶ 53(d)-(e).  In so doing, it touts Panama as having "the strongest bank-secrecy laws on earth."  *Id.* ¶ 50.  POLS's webpage shows that POLS expects its clients to

create offshore entities specifically for the purpose of concealing foreign accounts: "Most of our clients need a Panama corporate bank account for their Panama corporation (or Foundation), otherwise the entity is generally useless for achieving their objectives." *Id.* Ex. 33 at 2.

POLS also offers offshore merchant account services, which it promotes as "the perfect solution[] for [the client] to obtain privacy, and avoid all of the burdensome rules and regulations surrounding online e-commerce in [the client's] domestic country." *Id.* ¶ 53(e) & Ex. 34 at 1.  A merchant account is a bank account into which a business's credit card receipts are deposited. *Id.* ¶ 16.  If established offshore, such accounts enable a business's credit card receipts to be electronically diverted to the offshore bank.  U.S. persons can then transact business domestically but arrange to have their earnings deposited in the merchant account offshore, while not reporting the income.  *Id.*  In the IRS's experience, some taxpayers open merchant accounts offshore in the names of offshore shell companies, and use these accounts to evade taxation on their U.S. business income.  *Id.*  POLS claims to provide its clients with a means to conduct "Tax free Offshore Internet e-commerce business" through use of a "tax free" offshore corporation, an offshore bank account, and an online merchant account facilitated by POLS.  *Id.* ¶ 53(e) & Ex. 34 at 1.

Other members of the POLS Group similarly advertise that they can assist clients with concealing assets and avoiding taxes.  For example, Panama Corporation and Panama Tax Advisors echo POLS's website by marketing services to facilitate anonymous ownership, including the use of nominees and bearer shares.  *Id.* ¶¶ 83, 95.  Panama Surf Tours advises prospective clients to use offshore entities other than trusts to hold their assets "due to recent laws in many countries (including the USA, Canada, and UK) involving harsh reporting requirements on foreign trusts."  *Id.* ¶ 102 & Ex. 108 at 2.  Panama Wholesale Offshore Services

maintains a website called "Why go offshore?" that encourages prospective clients to "Secure Your Assets Today!" and asserts: "Because a corporation has a life of its own, a carefully designed corporate strategy allows you to care for your loved ones free from probate, inheritance taxes, and other legal and tax problems." *Id.* ¶ 77 & Ex. 58.

The POLS Group markets its services to U.S. persons. POLS lists prices in U.S. dollars. *Id.* Ex. 23. The POLS Group's websites and its agreements are in English, *see generally* Exs. to Fuentes Decl., and Panama Title & Escrow advertises its "English speaking staff," Fuentes Decl. Ex. 47 at 1. POLS maintains a courier address and post office box in Miami, Florida, and lists a toll free U.S. telephone and fax number on its website. *Id.* Exs. 4a, 4b, 4c, 4d, and 4e. POLS's webpage called "Why Go Offshore?" claims that "[a] new lawsuit is filed every 30 seconds in the US" and warns prospective clients to "act NOW to protect yourself" before they are "left penniless and in debt" by litigation. *Id.* Ex. 12 at 2-3. Panama Wholesale Offshore Services' webpage contains a purported testimonial from a U.S. person regarding the use of offshore services to evade taxes:

> The last thing I want to do is give away 50% of my money to the government when I die. . . . What right is it of the government to take my money just because I'm gone? I just won't allow that to happen.
> - Marian Stark, AZ, USA.

*Id*. Ex. 58 at 1.

Beyond the POLS Group's web advertising, the IRS has obtained information indicating that the POLS Group has U.S. customers. For example, the IRS learned that persons with a U.S. connection transferred over one million dollars to Online Products, Inc., between 2008 and 2011 with wire instructions such as "corporation package," "legal fees for entities," "renewal fees," and "annual fees." *Id.* ¶ 64. Similarly, the IRS has information showing that Panama Title &

Escrow received and/or sent wires and checks from or to persons with a U.S. connection between 2003 and 2013.  *Id.* ¶ 70.

C.  **Information from Other Sources Corroborates the IRS's Belief that U.S. Taxpayers Use the POLS Group to Evade Taxes**

Information obtained by the IRS from other enforcement efforts supports the IRS's belief that U.S. taxpayers are using the POLS Group's services to avoid paying taxes.  Through the IRS's Offshore Voluntary Disclosure Program, which allows U.S. taxpayers to voluntarily disclose foreign accounts or entities used to evade tax in exchange for fixed penalties, the IRS has learned of nearly 700 previously undisclosed accounts at Panamanian financial institutions. *Id.* ¶ 110.  One U.S. taxpayer participating in the program specifically acknowledged using POLS's services to create an offshore entity and offshore account in Panama, which that taxpayer had failed to report for tax purposes.  *Id.* ¶ 111.

Additionally, witnesses in a criminal trial involving a fraudulent tax and debt elimination scheme testified about using the POLS Group's services to create offshore entities.  An undercover agent investigating the scheme testified that when she wrote a blank check to a vendor for an offshore service, the final check was negotiated with Online Products, Inc., as the payee.  *Id.* ¶ 112.  A cooperating witness who had pled guilty in the scheme testified that POLS and Panama Offshore Services International provided assistance with setting up foreign entities using nominees in place of clients' names, and that POLS advised clients not to have any U.S. persons named in corporate records in Panama.  *Id.* ¶ 113.

IV.  **The Summonses**

To further its investigation, the IRS is seeking information through the Summonses that will allow it to identify U.S. taxpayer-clients of the POLS Group who have not disclosed the

existence of their Panamanian entities and accounts and who have failed to report related

income.  Specifically, the IRS is seeking information regarding the following class of persons:

> United States taxpayers who, at any time during the years ended December 31, 2013, through December 31, 2020, used the services of Panama Offshore Legal Services, including its predecessors, subsidiaries, and associates, to establish, maintain, operate, or control any foreign financial account or other asset; any foreign corporation, company, trust, foundation or other legal entity; or any foreign or domestic financial account or other asset in the name of such foreign entity.

*Id.* ¶¶ 2, 151.

The IRS seeks to summon documents from three groups of record holders.  *First*, the IRS

seeks records from couriers that are believed to have shipping records relating to U.S. customers

of the POLS Group: Federal Express Corporation; Fed Ex Ground Package System, Inc.; DHL

Express (USA), Inc.; and United Parcel Service, Inc.  *See id.* Exs. A-D.  The IRS believes that

these couriers have records regarding POLS Group customers because the websites of POLS and

several POLS associates encourage customers to use these couriers for shipments.[4]  *See, e.g.*, *id.*

¶¶ 57, 70, 81, 120.  Because these couriers can search their records based on the address of a

shipment's sender or recipient, these couriers should be able to identify instances in which their

services were used to ship documents to or from a POLS Group associate where the address of

either the shipper or recipient was in the United States.  *Id.* ¶ 121.  Thus, the IRS should be able

to use these records to identify U.S. taxpayers within the John Doe class.  *Id.*

*Second*, the IRS seeks records from financial institutions and entities that are believed to

have records of electronic funds transfers relating to U.S. customers of the POLS Group: the

---

[4] The IRS also seeks records of TNT USA Inc. and TNT Express (Canada) Ltd. ("TNT"). Fuentes Decl. ¶ 116.  TNT is among the couriers listed on POLS Group websites.  *Id.* ¶ 121. TNT was acquired by FedEx in 2016, and thus FedEx should have records of TNT shipments between U.S. persons and the POLS Group.  *Id.* ¶ 116.  Accordingly, the IRS does not seek to serve a separate summons on TNT.

Federal Reserve Bank of New York ("Federal Reserve NY") and The Clearing House Payments Company LLC ("Clearing House").[5]  *See id.* Exs. E-F.  The POLS Group advertises that it accepts payment by wire transfer, *id.* ¶ 126, and these entities are expected to have records related to such transfers.  Federal Reserve NY maintains the Fedwire Funds Service ("Fedwire"), which handles message transfer traffic initiating financial transactions between financial institutions, as well as the actual transfers of funds.  *Id.* ¶ 122.  Clearing House operates the Clearing House Interbank Payment System ("CHIPS"), which is the main electronic funds transfer system for U.S. dollar transfers among international banks.  *Id.* ¶ 125.  It is likely that when U.S. clients send U.S. dollar-denominated funds to a POLS Group associate, CHIPS is used for the cross-border segment of the transfer.  *Id.* ¶ 126.  Records of wire transfers sent between the POLS Group and its U.S. clients via Fedwire and CHIPS will help the IRS to identify U.S. taxpayers who may have used the POLS Group's services for tax avoidance.  *Id*. ¶¶ 124, 126.

     *Third*, the IRS seeks records from U.S. banks that maintain correspondent accounts for Panamanian banks known to be used by the POLS Group.  The U.S. banks to which the proposed Summonses are directed are HSBC Bank USA, N.A. ("HSBC"); Citibank, N.A. ("Citibank"); Wells Fargo Bank, N.A. ("Wells Fargo"); and Bank of America, N.A. ("Bank of America") (collectively, the "U.S. Correspondent Banks").  *See id.* Exs. G-J.  The IRS has learned that the POLS Group uses the services of at least three Panamanian banks, each of which has correspondent accounts at two or more of the U.S. Correspondent Banks: Credicorp Bank S.A.

---

[5] The POLS Group also advises customers to use Western Union Financial Services, Inc. ("Western Union") and MoneyGram Payment Systems, Inc. ("MoneyGram") to pay for its services.  Fuentes Decl. ¶ 149.  Concurrently with the filing of this Petition, the IRS is filing petitions seeking leave to serve John Doe summonses on Western Union and MoneyGram in the District of Colorado and the District of Minnesota, respectively.  *Id.* ¶¶ 10, 114.

("Credicorp"), Panameño de la Vivienda S.A. ("Banvivienda"), and Banco General S.A. ("Banco General"). *See, e.g.*, *id.* ¶¶ 62, 70, 135, 139-40, 144. Credicorp has correspondent accounts at HSBC, Bank of America, Wells Fargo, and Citibank, *id.* ¶¶ 135, 139, 143-44; Banvivienda has correspondent accounts at HSBC and Citibank, *id.* ¶¶ 137, 145; and Banco General has correspondent accounts at Wells Fargo and Citibank, *id.* ¶¶ 142, 144.

Because correspondent accounts are the principal means by which a foreign bank moves funds into and out of the United States, the IRS believes that records from these correspondent accounts will assist in identifying U.S. clients of POLS Group. *Id.* ¶ 131. Additionally, the IRS seeks anti-money laundering records from the U.S. Correspondent Banks. Because correspondent accounts are susceptible to money laundering, the USA PATRIOT Act and related regulations require U.S. financial institutions that maintain correspondent accounts for foreign banks to implement certain risk-based procedures and controls reasonably designed to detect suspected money-laundering activity. *Id.* ¶ 132. The anti-money laundering records may reveal aliases, pseudonyms, or nominees of U.S. taxpayers who are using the POLS Group's services to facilitate tax evasion, as well as those persons' contact information. *Id.* ¶ 133.[6]

---

[6] While POLS is a law firm, the summonses do not seek material likely to be subject to the attorney-client privilege. The summonses do not seek the contents of communications with counsel that would reflect legal advice or information provided for the purpose of obtaining or providing legal advice. *See Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015). Rather, they seek information such as contact information for the POLS Group and its customers, account information for accounts held by the POLS Group with the third-party summoned entities, records reflecting financial transfers, records reflecting shipment details, and reports such as anti-money laundering reports created by the third-party summoned entities. *See infra* Argument Section IV. Moreover, because the information sought has been voluntarily disclosed to third parties, it generally would not be covered by the privilege, as it has not been kept confidential. *Id.*

## ARGUMENT

### The Summonses Satisfy the Requirements for an IRS John Doe Summons

One of the IRS's key functions is to audit tax returns to ensure that all applicable taxes have been paid.  Accordingly, the Internal Revenue Code directs the Secretary of the Treasury (the "Secretary") to "cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax."  26 U.S.C. § 7601(a).  In aid of this function, the Secretary is authorized to summon records and testimony that may be relevant or material to an investigation:

> For the purpose of ascertaining the correctness of any return, making a return where none has been made, [or] determining the liability of any person for any internal revenue tax . . . , the Secretary is authorized . . . [t]o summon . . . any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax . . . , or any other person the Secretary may deem proper, to appear . . . and to produce such books, papers, records, or other data . . . as may be relevant or material to such inquiry . . . .

*Id.* § 7602(a).

Congress intended "to provide the Secretary with broad latitude to adopt enforcement techniques helpful in the performance of his tax collection and assessment responsibilities." *United States v. Euge*, 444 U.S. 707, 716 n.9 (1980).  Indeed, the Supreme Court has noted that the Secretary's summons power forms the "centerpiece" of the IRS's "expansive information-gathering authority."  *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984).  Because "the summons power of the IRS under the Code is quite broad, . . . courts are constrained to exercise caution before circumscribing the summons authority."  *PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 216 (2d Cir. 1992); *see also Arthur Young*, 465 U.S. at 816 ("[T]he very

language of § 7602 reflects . . . a congressional policy choice *in favor of disclosure* of all

information relevant to a legitimate IRS inquiry." (emphasis in original)).

The IRS's authority to issue "John Doe" summonses to discover the identity of

individuals who may have failed to report their income was recognized by the Supreme Court in

*United States v. Bisceglia*, 420 U.S. 141 (1975), and later codified at 26 U.S.C. § 7609(f).

Section 7609 requires the Secretary to establish three prerequisites before a John Doe summons

may be served:

> Any summons . . . which does not identify the person with respect
> to whose liability the summons is issued may be served only after a
> court proceeding in which the Secretary establishes that–
>
> > (1) the summons relates to the investigation of a particular
> > person or ascertainable group or class of persons,
> >
> > (2) there is a reasonable basis for believing that such person
> > or group or class of persons may fail or may have failed to
> > comply with any provision of any internal revenue law, and
> >
> > (3) the information sought to be obtained from the
> > examination of the records or testimony (and the identity of
> > the person or persons with respect to whose liability the
> > summons is issued) is not readily available from other
> > sources.

26 U.S.C. § 7609(f).  Additionally, "[t]he Secretary shall not issue any summons . . . unless the

information sought to be obtained is narrowly tailored to information that pertains to the failure

(or potential failure) of the person or group or class of persons . . . to comply with one or more

provisions of the internal revenue law which have been identified."  *Id.*  The Court's

determination as to whether the IRS has met the requirements for issuance of a John Doe

summons "shall be made ex parte and shall be made solely on the petition and supporting

affidavits."  *Id.* § 7609(h)(2).

The Secretary has established the three statutory prerequisites for the Summonses at issue here.  *First*, the Summonses relate to the investigation of an ascertainable group or class of persons, namely, U.S. taxpayers who used the POLS Group's services to establish, maintain, operate, or control offshore assets, accounts, or entities.  *Second*, there is a reasonable basis for believing that U.S. taxpayers who held an interest in any such assets, accounts, or entities concealed them and the related income from the IRS, thereby violating one or more provisions of the internal revenue laws.  *Third*, the information sought is not readily available to the IRS from other sources.  Additionally, as described below, the Secretary may issue the Summonses because the information sought is narrowly tailored to information that pertains to the potential failure of the John Doe class to comply with the internal revenue laws.[7]

## I.   The Investigation Concerns an Ascertainable Class

The Summonses relate to an investigation of an ascertainable group of people, namely, U.S. taxpayers who used the POLS Group's services at any time between 2013 and 2020 to establish, maintain, operate, or control foreign financial accounts, assets, or legal entities, or any foreign or domestic financial account or other asset in the name of a foreign entity.  Fuentes Decl. ¶ 151.

Courts have found that the "ascertainable group" prong of Section 7609(f) is satisfied where the proposed summons specifies a particular group of taxpayers in whom the IRS has expressed an interest.  For example, this prong was satisfied where a summons "squarely

---

[7] When the Secretary seeks to issue a John Doe summons, jurisdiction lies in the district in which the person or entity to be summoned "resides or is found."  26 U.S.C. § 7609(h)(1).  A corporation "resides" or "is found" in a district in which it maintains a physical presence.  *Mensh v. United States*, No. 08 Civ. 4162 (DLI) (ALC), 2009 WL 2242295, at *2 (E.D.N.Y. Jul. 27, 2009).  Here, each proposed summons recipient has a physical presence within this district, because the entity has either a headquarters, a banking center, or a store location within the district.  *See id.*; Fuentes Decl. ¶¶ 115, 117-18, 122, 125, 135, 139-40, 144.

particularize[d] the individuals sought from the general public" by identifying the class as

California residents who, between 2005 and 2010, were involved in certain property transfers for

little or no consideration. *See In re Tax Liab. of Does*, No. 2:10-mc-00130-MCE-EFB, 2011 WL

6302284, at *2 (E.D. Cal. Dec. 15, 2011). Similarly, the IRS satisfied the "ascertainable group"

standard where a summons concerned U.S. taxpayers who, as agents for subsidiaries of a certain

company, sold credit insurance policies reinsured with entities in the Turks and Caicos Islands.

*See In re Tax Liab. of John Does*, No. 03-22793-CIV, 2003 WL 22953182, at *1 (S.D. Fla. Oct.

30, 2003) ("*American Bankers Insurance Group*"). Additionally, courts in this district have

repeatedly authorized the issuance of John Doe summonses where the target group is comprised

of individuals with interests in financial accounts managed by a particular entity. *See In re Tax

Liabs. of John Does,* No. 13-mc-377-P1, Dkt. No. 3 (S.D.N.Y. Nov. 12, 2013) ("*In re

Butterfield*") (order granting *ex parte* petition for leave to serve John Doe summonses in

investigation of U.S. taxpayers who had interests in or authority over financial accounts

maintained at or managed by The Bank of N.T. Butterfield & Son Limited ("Butterfield") or

other institutions that Butterfield permitted to transact business through its U.S. correspondent

accounts); *In re Tax Liabs. of John Does*, No. 13-mc-378-P1, Dkt. No. 3 (S.D.N.Y. Nov. 7,

2013) ("*In re ZKB*") (order granting *ex parte* petition for leave to serve John Doe summonses in

investigation of analogous group of U.S. taxpayers with interests in financial accounts related to

Zurcher Kantonalbank); *In re Tax Liabs. of John Does*, No. 13-mc-00021-P1, Dkt. No. 4

(S.D.N.Y. Jan. 29, 2013) ("*In re Wegelin*") (order granting *ex parte* petition for leave to serve

John Doe summonses in investigation of analogous group of U.S. taxpayers with interests in

financial accounts related to Wegelin & Co., including accounts at financial institutions that

Wegelin & Co. permitted to transact client business through its United States correspondent account).

Here, the relevant class of U.S. taxpayers are particularized from the general public, because the class is limited to U.S. individuals who used the POLS Group's services to establish and maintain foreign accounts and entities during certain years.  The investigation underlying the Summonses thus relates to an "ascertainable group or class of persons."  26 U.S.C. § 7609(f)(1).

## II.  There Is a Reasonable Basis To Believe that the John Doe Class May Fail, or May Have Failed, To Comply with the Internal Revenue Laws

The IRS has a reasonable basis to believe that the U.S. taxpayers who made use of the POLS Group's services during the relevant time period may fail or may have failed to comply with the internal revenue laws.  To meet the "reasonable basis" prong, the IRS need only show that a transaction has occurred that is "of such a nature as to be reasonabl[y] suggestive of the possibility that the correct tax liability with respect to that transaction may not have been reported."  H.R. Rep. No. 94-0658 at 311 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3208. When enacting Section 7609(f), Congress did "not intend to impose an undue burden on the [IRS] in connection with obtaining a court authorization to serve this type of summons."  H.R. Rep. No. 94-0658 at 311, *reprinted in* 1976 U.S.C.C.A.N. at 3207.  Rather, Congress sought to ensure that the IRS would have "a specific situation to present in the court," instead of using the summonses to engage in a "possible 'fishing expedition.'"  *Id.*; *see also In re Tax Liabs. of Does*, 688 F.2d 144, 149 (2d Cir. 1982) (Section 7609(f) was "concerned only with . . . preclud[ing] the IRS from using [John Doe] summonses to engage in possible 'fishing expeditions'") (quoting H.R. Rep. No. 94-658 at 311).  Courts, therefore, have concluded that "Congress did not intend to impose stringent restrictions on the Service's investigatory function . . . .  [Rather, the intent was] to prevent the Service from exercising its summons power in an arbitrary or quixotic

manner." *In re Tax Liab. of Does*, 671 F.2d 977, 979-80 (6th Cir. 1982) ("*Columbus Trade Exchange*").

Here, the evidence that the IRS has developed to date with respect to the POLS Group shows that the POLS Group's clients engage in transactions that are reasonably suggestive of tax avoidance. The POLS Group specifically markets its services to U.S. taxpayers, emphasizes services to assist clients in holding assets in secret, and promotes its clients' ability to remain anonymous, including as to taxes. *See, e.g.*, Fuentes Decl. ¶¶ 50-55. The POLS Group offers a variety of services related to anonymous banking, the establishment of offshore bank accounts, and the formation of offshore corporations and foundations, including shelf corporations and foundations. *See, e.g.*, *id.* ¶¶ 50, 53. In the IRS's experience, offshore tax avoidance almost always involves such accounts and offshore structures. *Id.* ¶ 9. The POLS Group also advertises services such as mail forwarding, the use of nominee officers and directors, and the availability of bearer shares, all of which assist clients in concealing their beneficial ownership of assets. *See, e.g.*, *id.* ¶¶ 51, 53, 55.

Further, the POLS Group specifically describes their products as facilitating avoidance of taxes and reporting requirements. POLS promises its clients "100% anonymity, privacy and confidentiality." *Id.* ¶ 50. POLS advertises its Belize Corporation services by touting the fact that there are "No Tax Treaties with other countries so other governments cannot gain access to Belize Offshore Corporation records." *Id.* Ex. 35 at 2. POLS describes its offshore merchant account services as a means for avoiding "all of the burdensome rules and regulations surrounding online e-commerce in [the client's] domestic country." *Id.* ¶ 53(e) & Ex. 34. And in encouraging clients to "go offshore," POLS associate PWOS asserts that "a carefully designed

corporate strategy" involving offshore structures "allows [clients] to care for [their] loved ones free from probate, inheritance taxes, and other legal and tax problems." *Id.* ¶ 77 & Ex. 58.

In the IRS's experience, the above-described services offered by the POLS Group "are the hallmarks of offshore tax evasion." *Id.* ¶ 154.  Further, the IRS has learned that "there is a direct correlation between unreported income and the lack of visibility of that income to the Service." *Id.* ¶ 158.  In particular, "when the third-party payer of income to a person is not required to, or fails to, report that income to the Service, the taxpayer-recipient is far less likely to report it on his or her tax returns," and this is especially true when offshore accounts are involved.  *Id.*

This is sufficient for the IRS to satisfy the "reasonable basis" requirement of Section 7609(f).  Courts have found that this prong is met if the IRS has knowledge of similar past transactions that were associated with taxpayers failing to comply with internal revenue laws. *See Columbus Trade Exchange*, 671 F.2d at 980 (the IRS had a reasonable basis to investigate the tax returns of members of a particular barter exchange based on the fact that, in the IRS's experience, members of other barter exchanges had historically exhibited numerous reporting errors in reporting non-cash transactions on their tax returns); *United States v. Pittsburgh Trade Exch., Inc.*, 644 F.2d 302, 306 (3d Cir. 1981) (IRS agent's testimony that transactions of the type the summoned party arranged for its clients were "inherently susceptible . . . to tax error" was sufficient to meet the "reasonable basis" prong); *see also United States v. Ritchie*, 15 F.3d 592, 601 (6th Cir. 1994) (clients' payment for legal services with large amounts of cash provided a reasonable basis to issue a John Doe summons).

Similarly, here, the IRS believes based on its experience and the evidence developed to date that U.S. taxpayers have made use of the POLS Group's services to evade reporting

requirements and payment of income taxes. This provides the IRS with a reasonable basis to believe that the John Doe class of U.S. taxpayers "may fail or may have failed to comply with any internal revenue law." 26 U.S.C. § 7609(f).

### III. The Information Sought About the Target Class, Including the Identities of the Class's Members, Is Not Readily Available from Other Sources

The information the IRS is seeking through the summonses is not readily available from other sources. To the contrary, the very need for the John Doe summons arises because the U.S. clients of POLS failed to disclose their foreign bank accounts, assets, and entities to the IRS and, therefore, remain unknown to the IRS. *See American Bankers Insurance Group*, 2003 WL 22953182, at *1 (granting a petition for a John Doe summons on the ground that the IRS needed information from the recipient of the summons to continue its investigation of a class of taxpayers violating the internal revenue laws).

Courts have approved the issuance of John Doe summonses, and held that the identities of the persons to be investigated are not "readily available," in cases where the identities were presumably in the hands of foreign institutions. *See, e.g.*, *In re Tax Liabs. of Does*, No. 00-cv-3919, 2000 WL 34538137, at *1 (S.D. Fla. Oct. 30, 2000); *see also In re Tax Liabs. of Does*, No. 02-22404-CIV, 2002 WL 32879613, at *1 (S.D. Fla. Aug. 20, 2002) (authorizing service of a John Doe summons seeking the identity of U.S. taxpayers who held certain credit card accounts with ties to foreign banks); *In re Tax Liabs. of Does*, No. 11-cv-01686-PJH, Dkt. No. 10 (N.D. Cal. Apr. 7, 2011) (authorizing the issuance of a John Doe summons on HSBC Bank USA, N.A. seeking financial account records establishing the identities of U.S. taxpayers with interests in or signature or other authority with respect to HSBC's Indian bank accounts).

In particular, this Court has repeatedly authorized the issuance of John Doe summonses seeking the identity of U.S. taxpayers with direct or indirect interests in foreign financial

accounts.  *See In re Butterfield,* No. 13-mc-377-P1, Dkt. No. 3 (order granting *ex parte* petition

for leave to serve John Doe summonses in investigation of U.S. taxpayers who had interests in or

authority over financial accounts maintained at or managed by Butterfield or other institutions

that Butterfield permitted to transact business through its U.S. correspondent accounts); *In re*

*ZKB*, No. 13-mc-378-P1, Dkt. No. 3 (authorizing John Doe summonses in investigation of U.S.

taxpayers with interests in financial accounts related to Zurcher Kantonalbank); *In re Wegelin*,

No. 13-mc-00021-P1, Dkt. No. 4 (authorizing John Doe summonses in investigation of U.S.

taxpayers with interests in financial accounts related to Wegelin & Co., including accounts at

financial institutions that Wegelin & Co. permitted to transact client business through its United

States correspondent account).

Here, the IRS is unable to identify the members of the target class; in fact, the purpose of

the Summonses is to discover the class members' identities.  As described above, the POLS

Group's advertising emphasizes the measures it takes to conceal its clients' identities and to

facilitate anonymous ownership of foreign assets and entities.[8]  Thus, the IRS has established

that the information sought by the Summonses is not readily available to the IRS from other

sources, if at all.  *See* 26 U.S.C. § 7609(f)(3).

---

[8] As described in the Fuentes Declaration, though the Foreign Account Tax Compliance Act
("FATCA") requires foreign financial institutions to report annually to the IRS certain
information about financial accounts held by U.S. taxpayers, FATCA does not apply to any of
the summoned parties here.  Thus, even assuming that the Panamanian banks used by the POLS
Group—to which FATCA's requirements do apply—have filed all required FATCA reports with
the IRS, the IRS would not have the information sought through the Summonses.  *See* Fuentes
Decl. ¶¶ 36-38.

IV. **The Information Sought Is Narrowly Tailored to Information that Pertains to the Failure or Potential Failure of the John Doe Class To Comply with the Internal Revenue Laws**

For the reasons described above, the IRS has established the three statutory prerequisites for issuance of the Summonses.  *Id.* § 7609(f)(1)-(3).  Additionally, the IRS may issue the Summonses because each of the items requested is narrowly tailored to assist the IRS in investigating the unknown members of the John Doe class for their failure, or potential failure, to comply with the internal revenue laws, specifically their obligation to file an income tax return with the IRS reporting income from all sources worldwide and to disclose certain foreign assets. *Id.* § 7609(f).  The requirement that a John Doe summons be "narrowly tailored to information that pertains to the failure (or potential failure) of the [John Doe class] to comply with one or more provisions of the internal revenue law" was added to 26 U.S.C. § 7609(f) to ensure that "the information sought in the summons [is] at least potentially relevant to the tax liability of an ascertainable group," and that the summons is not used "for the purposes of a fishing expedition."  H.R. Rep No. 116-39, at 41 (2019).  The provision "is not intended to change the *Powell* standard [i.e., the showing the IRS must make in support of summons enforcement] or otherwise affect the IRS's burden of proof."[9]  *Id.* at 42; *see also* Joint Committee on Taxation, *Description of H.R. 1957, the "Taxpayer First Act of 2019,"* at 15 (2019).

Those standards are satisfied here.  First, the summonses to Federal Express Corporation; Fed Ex Ground Package System, Inc.; DHL Express (USA), Inc.; and United Parcel Service, Inc.

---

[9] Where the Government seeks to enforce an IRS summons, it must establish "[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's possession, and [4] that the administrative steps required by the Code have been followed . . . ." *United States v. Powell*, 379 U.S. 48, 57-58 (1964).  The Government's burden of showing such compliance is "minimal." *United States v. White*, 853 F.2d 107, 111 (2d Cir. 1988); *United States v. Davey*, 543 F.2d 996, 1000 (2d Cir. 1976).

seek (1) information about the POLS Group's accounts with those couriers, and (2) documents related to deliveries to or from the POLS Group that were sent to or from U.S.-based addresses. *See* Fuentes Decl. Exs. A-D.  As discussed above, the websites of POLS and its associates encourage customers to use these couriers for shipments.  *See, e.g.*, *id.* ¶¶ 57, 70, 81, 120. Further, because these couriers can search their records based on the sender's or recipient's address, these couriers should be able to identify instances in which their services were used to ship documents to and from a POLS Group associate where the address of either the shipper or recipient was in the United States.  *Id.* ¶ 121.  This will assist the IRS in identifying U.S. customers of the POLS Group who are members of the John Doe class.  *Id.*  Additionally, the information requested about the POLS Group's accounts with the couriers (including contact, payment, and billing information provided by the POLS Group) will generate new leads for the IRS to identify additional members of the John Doe class, as well as possible tax avoidance by those individuals.

Second, the summonses to Federal Reserve NY, which operates the Fedwire system, and Clearing House, which operates CHIPS, seek records that the IRS anticipates will reflect electronic funds transfers relating to U.S. customers of the POLS Group.  *See id.* Exs. E-F.  As noted above, the POLS Group advertises that it accepts payment by wire transfer.  The summonses seek records of any wire transfers sent via Fedwire or CHIPS for which (1) the originator or beneficiary of the transfer is a POLS Group associate or uses one of the POLS Group's mailing addresses, or (2) the instruction or reference field of the wire transfer references the POLS Group or one of its addresses.  *Id.*  Because Fedwire and CHIPS handle only U.S.-based or U.S.-dollar-denominated transfers, records of wire transfers sent over these services involving the POLS Group will assist the IRS in identifying U.S. taxpayers who may have used

the POLS Group's services for tax avoidance.  *Id*. ¶¶ 122-26.  The IRS further expects that these records may reveal banks used by the POLS Group other than those already known to the IRS, which may assist the IRS in identifying unreported taxable income.  *Id.* ¶¶ 124, 126.

Finally, the summonses to the U.S. Correspondent Banks seek bank records for correspondent accounts of Panamanian banks used by the POLS Group.  *Id.* Exs. G-J.  This includes specific correspondent accounts that the IRS knows have been used by the POLS Group, as well as other correspondent accounts of Panamanian banks that are used by the POLS Group.  *See id.*; *id.* ¶¶ 62-63, 69-70, 80, 127-45.  As discussed above, correspondent banks are used by domestic owners of offshore accounts to access those accounts remotely, and to facilitate the transfer of U.S. dollar denominated funds.  *Id.* ¶ 128.  The IRS expects the correspondent account records to identify U.S. clients of the POLS Group and to reflect information about those individuals' use of foreign entities to conceal assets.  *Id.* ¶ 130.  For example, records of deposited items are expected to contain evidence of payments to the POLS Group from its U.S. clients, and cancelled checks may reflect evidence of payments made by the POLS Group either to its U.S. clients or on their behalf.  *Id.* ¶ 131.  The correspondent account records are expected to reflect the names, addresses, and financial account numbers of members of the John Doe class. *Id.*  Additionally, the anti-money laundering records requested from the summoned banks may reveal aliases, pseudonyms, or nominees of U.S. taxpayers who are using the POLS Group's services to facilitate tax evasion.  *Id.* ¶ 133.[10]

---

[10] The summonses to the banks are not duplicative of the summonses to Federal Reserve NY and Clearing House, because the correspondent accounts will have records of fund transfers that did not go through either the Fedwire or the CHIPS systems.  *Id.* ¶ 131.

Thus, each of the items sought by the Summonses is targeted toward obtaining information that may further the IRS's investigation of the John Doe class and its members' failure or potential failure to comply with the internal revenue laws.

## CONCLUSION

For the foregoing reasons, the Government's petition to issue the Summonses should be granted.

Dated: New York, New York
      May 4, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:    /s/ Talia Kraemer
      TALIA KRAEMER
      Assistant United States Attorney
      Tel.:   (212) 637-2822
      Fax:   (212) 637-2702
      E-mail: talia.kraemer@usdoj.gov